IMBERT IMPORTS, INC., et al.,
Appellants,

v.

The UNITED STATES, Appellee.
A.R.D. 294; Reap. No. R63/5025
and 13 others.

United States Customs Court,
Second Division, Appellate Term.
Sept. 10, 1971.

Barnes, Richardson & Colburn, New York City (Norman C. Schwartz, David O. Elliott, New York City of counsel), for appellants.

L. Patrick Gray, III, Asst. Atty. Gen. (Glenn E. Harris, trial atty.), for appellee.

Before LANDIS, MALETZ and NEWMAN, Judges.

NEWMAN, Judge:

Plaintiffs below have filed this application for review seeking reversal of the decision and judgment of Watson, J. in Imbert Imports, Inc., et al. v. United States, 65 Cust.Ct. 697, 314 F.Supp. 784, R.D. 11718 (1970), wherein the trial judge upheld dumping duty appraisements on fourteen entries of portland gray cement[1] exported by Fabrica Dominicana de Cemento C, por A. in the Dominican Republic during the period between October 25, 1962 and March 25, 1963, and entered at the port of San Juan, Puerto Rico. We affirm.

### STATUTES INVOLVED

Section 201(a) of the Antidumping Act of 1921, as amended (19 U.S.C. § 160(a)).

Sec. 201. (a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States.

The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in this Act called a "finding") of his determination and the determination of the said Commission. * * *

Section 201(c) of the Antidumping Act of 1921, as amended (19 U.S.C. § 160(c)).

(c) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the United States Tariff Commission, upon making its determination under subsection (a) of this section, shall each publish such determination in the Federal Register, with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative.

The "record" is entirely documentary and consists of certified copies of papers filed with the United States Tariff Commission during its investigation, and the Commission's "Determination of Likelihood of Injury" (TC Publication 87, April 19, 1963).

The "official record" before the Commission discloses that:

On January 21, 1963, the Commission was advised by the Acting Assistant Secretary of the Treasury that portland cement, other than white, nonstaining portland cement, from the Dominican Republic was being or was likely to be sold in the United States at less than fair value within the meaning of the Antidumping Act of 1921, as amended.[2]

On January 25, 1963 the Commission issued a notice that it had instituted an investigation pursuant to section 201(a)

1. This case is the third in a series involving dumping of portland gray cement. See City Lumber Co. et al. v. United States, 64 Cust.Ct. 826, A.R.D. 269, 311 F.Supp. 340 (1970), appeal pending; James C. Goff Company et al. v. United States, 441 F.2d 671, 58 CCPA 147, C.A.D. 1019 (1971).

2. On September 2, 1962, prior to the instant exportations, the Secretary of the Treasury ordered appraisement of the entries of portland gray cement to be withheld. 27 F.R. 9227.

of the Antidumping Act "to determine whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States". Such notice was published in the Federal Register. 28 F.R. 882.

On April 19, 1963, the Commission issued a determination (Chairman Dorfman dissenting) "that an industry in the United States is likely to be injured by reason of the importation of portland cement, other than white, nonstaining portland cement, from the Dominican Republic, sold at less than fair value within the meaning of the Antidumping Act, 1921, as amended".[3] As required by section 201(c) of the Antidumping Act of 1921 (19 U.S.C. § 160(c)), the majority and minority determinations of the Commission were followed by a statement of reasons therefor. T.C. Publication 87, *supra;* 28 F.R. 4047.

The views stated by the majority of the Commission are quoted *in extenso,* and provide a helpful factual background:

The imports of portland cement from the Dominican Republic sold at less than fair value were entered largely at the port of New York. The imports entered at that port were marketed almost exclusively in the metropolitan area of New York City. For purposes of this determination this area constitutes a "competitive market area." The domestic plants that have historically supplied portland cement in this competitive area and in recent years have sold substantial quantities of cement there are considered to constitute "an industry" for the purposes of the Antidumping Act.

\* \* \* \* \* \*

The Dominican producer has the capacity to sell considerably increased quantities of portland cement in the United States and has sufficient mo-

tivation to do so. In recent years the Dominican market has provided an outlet sufficient to take only about half of the potential production of that country's cement plant. Even with substantial exports, it has generally operated with considerable excess capacity. Through a form of price discimination [sic]—i. e., through sales at prices below those charged in the home market—but at prices sufficiently high to cover out-of-pocket costs and to make a positive contribution to net return, the Dominican producer can achieve more complete utilization of plant capacity and a lowering of average unit costs. His inducement to attain a level of output approaching full capacity therefore is strong. Consequently, the very substantial market in the New York metropolitan area constitutes a continuing and attractive lure for the Dominican management seeking to expand production and reduce costs. Indeed, the instant case represents the second occasion in which the Treasury Department has advised the Commission that portland cement from the Dominican Republic was being sold in the United States at less than fair value.

Somewhat comparable circumstances cause the domestic producers of cement which customarily supply the New York metropolitan market to be vulnerable to competition from imports sold in the United States at less than fair value. In recent years producers supplying this market have generally operated at about 70 percent of capacity. Not only do sales of imported cement at less than fair value tend to repress prices in that marketing area but it is also difficult for domestic producers to compete therewith inasmuch as the price is based not on lower costs but on discrimination. Domestic manufacturers, moreover, are precluded from making as complete use

---

3. The Commission's "determination" notes that it was based upon "written submissions from interested parties and all factual information obtained by the Commission's staff". TC Publication 87, page 2. No public hearing was held.

of their productive facilities as they would be able to do in the absence of such competition. The injury that is likely to be sustained thereby would be reflected in continuing market instability and higher production costs. Because of both legal and economic restraints, however, domestic producers would be unable to increase volume by resort to the same kind of price discrimination.

Little has occurred in recent months to alter the situation that has twice given rise to sales in the United States of Dominican portland cement at less than fair value. The capacity and incentive for making such shipments remain. Domestic producers will be no less vulnerable in the future than they have been to date. In the opinion of the Commission, therefore, the portland cement industry serving the New York metropolitan market is likely to be injured by reason of importation of such cement sold in the United States at less than fair value.

Appellants' sole claim is that the Tariff Commission's "injury determination"[4] is invalid. Such claim is advanced on the theory that in the absence of a valid injury determination by the Commission, there can be no valid dumping duty appraisement. Cf. United States v. Central Vermont Railway Co., 17 CCPA 166, T.D. 43474 (1929); United States v. Tower & Sons, 14 Ct.Cust.App. 421, T.D. 42058 (1927).

In support of their claim, appellants contend:

(1) The Tariff Commission violated its statutory authority in basing its injury determination in part on the mere presence of sales at less than fair value.

(2) The Tariff Commission functioned as an agency within the meaning of Administrative Procedure Act and its injury determination should be set aside as arbitrary.

(3) The Tariff Commission's determination, insofar as it encompasses Puerto Rican imports, constitutes excessive remedial action.

We shall consider appellants' contentions in the above order.

(1) Appellants' argument is, in essence, that the Commission substantially equated injury with sales at less than fair value; and consequently, the Commission's action is *ultra vires* or in excess of its delegated authority.[5] We cannot agree.

The Act requires that the Commission shall determine "whether an industry in the United States is being or is likely to be injured * * * *by reason of* the importation of [dumped] merchandise". [Emphasis added.] Thus, the *statute in effect mandates* the Commission to focus upon dumped imports as a cause of injury or likelihood of injury to domestic industry. Consequently, we fail to understand appellants' position that the Commission exceeded its delegated authority by considering the factor of dumped imports. Especially in the present case, where the Commission was faced with recurring or renewed dumping of portland cement by the exporter, clearly the Commission would have failed in its statutory duty had it ignored that factor in determining whether a domestic industry was injured or was likely to be injured "by reason of" such dumping. Hence, while the presence of dumping may not be regarded by the Commission as *ipso facto* injurious

4. For purposes of this opinion, the term "injury determination" refers to our includes (depending upon the context) a determination of likelihood of injury. That determination is fully authorized by statute. Ellis K. Orlowitz Company v. United States, 50 CCPA 36, 41, C.A.D. 816 (1963); *City Lumber Co.*, supra, note 1.

5. There is no dispute that it is within the scope of our judicial review to determine whether the Commission acted within its delegated authority or *ultra vires*. See *City Lumber Co.*, supra, note 1.

to a domestic industry,[6] such dumping nevertheless must be evaluated as a causation factor in making the finding prescribed by the statute.

In the present case, we see no indication in the Commission's "Majority Statement of Reasons" that sales at less than fair value were considered *ipso facto* injurious. On the contrary, the Commission's finding of likelihood of injury (viz., "continuing market instability" and "higher production costs") was based on such factors as price repression in the New York metropolitan marketing area, diminished utilization of productive capacity, and finally the exporter's capacity and incentive to make future sales in the United States at less than fair value.

We therefore conclude that the trial court did not err in holding:

* * * The theory of law underlying its decision, namely, that a likelihood of injury is as sufficient as an actual injury and that such factors as sales at less than fair value and capacity and incentive for making future sales, may properly be considered, is correct. * *

(2) Appellants contend that the Commission's finding "is primarily founded upon the fact of recurring sales at less than fair value and is therefore arbitrary, an abuse of discretion and contrary to law". Review is sought pursuant to 5 U.S.C. § 1009(e) (B) (1),[7] which is part of the Administrative Procedure Act, 5 U.S.C. § 1001 et seq.[8]

This court has held that "the Administrative Procedure Act is applicable to proceedings under the Antidumping Act of 1921". Elof Hansson, Inc. v. United States, 43 Cust.Ct. 627, A.R.D. 114, 178 F.Supp. 922 (1959), rev'd on other grounds, United States v. Elof Hansson Inc., 296 F.2d 779, 48 CCPA 91, C.A.D. 771 (1960), cert. den. 368 U.S. 899, 82 S.Ct. 179, 7 L.Ed.2d 95 (1961); see also The Hoenig Plywood Corporation v. United States, 51 Cust.Ct. 336, R.D. 10569 (1963). Without making reference to the foregoing pertinent decisions in its brief or oral argument, appellee nevertheless insists that the Administrative Procedure Act has no applicability to our review of injury determinations of the Tariff Commission.

■ Under the circumstances of this case, we do not deem it necessary to decide whether the Commission's finding may be set aside under § 1009(e) (B) (1) of the Administrative Procedure Act, since in any event we are not persuaded that such finding is arbitrary, an abuse of discretion or otherwise contrary to law. As stated *supra,* recurring or renewed dumping of portland cement was a causation factor which the Commission properly considered in making its finding.

■ Appellant further argue that the Commission's finding is "lacking in any supportable evidence". Such contention overlooks the fact that a Tariff Commission injury investigation is not required to be "on the record", but rather is authorized to be made upon "such investigation as it [Commission] deems necessary". 19 U.S.C. § 160(a). Much of the Commission's information may be confidential and not open to public inspection or judicial review. Under these circumstances, plainly the substantial evidence rule is inappropriate in reviewing injury determinations of the Tariff Commission. Cf. Kleberg & Co., Inc. v. United States, 71 F.2d 332, 21 CCPA 110, T.D. 46446

---

6. If the reverse were true, it is apparent that the Commission's responsibility for injury determinations would be useless and a mere sham undertaking.

7. Now 5 U.S.C. § 706(2) (A).

8. See also Berger, Administrative Arbitrariness and Judicial Review, 65 Col.Law

Rev. 55 (1965), wherein the author urges that "the right to be protected against arbitrariness is rooted in the Constitution", and that "judicial review of arbitrary action is a matter of right, not of grace".

(1933); but cf. City Lumber Co. et al. v. United States, 64 Cust.Ct. 826, A.R.D. 269, 311 F.Supp. 340 (1970); appeal pending. See also Metzger and Musrey, Judicial Review of Tariff Commission Actions and Proceedings, 56 Cornell L. Rev. 285, 329–330 (1971).

(3) Finally, we consider appellants' contention that these Puerto Rican importations should be exempted from the imposition of dumping duties inasmuch as the Commission found likelihood of injury to the portland cement industry serving only the New York metropolitan market.[9] Appellants' theory is that the Tariff Commission possesses a "selection of remedial action" and that "the determination rendered was excessive in its application to Puerto Rican imports".

■ Appellants' theory, in our view, manifests a misconception concerning the scope of the power and duties of the Tariff Commission under the Antidumping Act. Essentially, the Commission's role under the Act is a limited one, viz: to ascertain (by such investigation as it deems necessary) whether an industry in the United States is being or likely to be injured or prevented from being established, by reason of dumping; and to notify the Secretary of the Treasury of its determination. The Commission formulates no "order" or "decree". Although the Commission may exercise broad discretion in the selection of methods used to find the facts called for by the statute, it clearly has no discretion to fashion antidumping remedies. In point of fact, the Commission has no authority to take any direct remedial action to restrain dumping.

■ While the Act mandates the taking of prescribed remedial action in the event of dumping and resultant injury to an industry in the United States, authority to take such action rests with the Secretary of the Treasury and the customs officials. Moreover, and in any event, under the Constitution the assessment of duties [10] must be uniform throughout the United States, and by statute the same duties must be assessed on merchandise imported into Puerto Rico as are required to be collected on importations into the United States. U.S.Const. Art. 1, § 8, Cl. 1; 48 U.S.C. § 739; see also 19 U.S.C. § 172.

■ We conclude, therefore, that when dumping duties are imposed they are applicable to importation of the affected merchandise at every port of entry, including Puerto Rico, whether or not importations of such merchandise at a particular port are causing injury to an industry in the United States. Accordingly, the dumping duty appraisements herein are valid, notwithstanding the absence of injury or likelihood of injury to the portland cement industry in Puerto Rico.

In view of the foregoing, we agree with the determination of the trial court upholding the validity of the Tariff Commission's finding, and the appraisements under the Antidumping Act. This court hereby adopts and incorporates by reference the findings of fact made by the trial court, and concludes as matters of law:

1. That the Tariff Commission did not exceed the scope of its delegated authority under the Antidumping Act of 1921.

---

9. The Commission considered the portland cement producers in the metropolitan area of New York City to be "an industry" for purposes of its injury determination. Cf. Ellis K. Orlowitz Company v. United States, *supra*, note 4.

10. Dumping duties are not penal in nature, but are "additional duties" to equalize competitive conditions between the exporter and American industries affected. C.J. Tower & Sons v. United States, 71 F.2d 438, 21 CCPA 417, T.D. 46943 (1934).

2. That the Commission's finding was not arbitrary, an abuse of discretion, or otherwise contrary to law.

3. That the imposition of dumping duties on importations into Puerto Rico was correct.

4. That the appraisements for purposes of assessing special dumping duties under the Antidumping Act of 1921 were made pursuant to a valid finding of likelihood of injury by the Tariff Commission.

5. That the values and prices returned by the appraiser under the provisions of the Antidumping Act of 1921 were not challenged and are affirmed.

The decision and judgment of the trial court are affirmed. Judgment will be entered accordingly.